IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED REGIONAL HEALTH CARE SYSTEM,<br><br>*Defendant*. | Civ. No. _____<br><br>**COMPLAINT** |

The United States of America, acting under the direction of the Attorney General of the United States, and the State of Texas, by and through the Texas Attorney General, bring this civil antitrust action to enjoin defendant United Regional Health Care System ("United Regional") from entering into, maintaining, or enforcing contracts with commercial health insurers that effectively prevent those insurers from contracting with United Regional's competitors, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and to remedy the effects of its unlawful conduct.  Plaintiffs allege as follows:

**I.      NATURE OF THE ACTION**

1.  United Regional has monopoly power in two relevant product markets in Wichita Falls, Texas and the surrounding area: (1) the sale of general acute-care inpatient hospital services ("inpatient hospital services") to commercial health insurers, and (2) the sale of outpatient surgical services to commercial health insurers.  United Regional has an approximately 90% share of the market for inpatient hospital services sold to commercial

insurers and a greater than 65% share of the market for outpatient surgical services sold to commercial insurers.  All health insurance companies in the relevant geographic market consider United Regional a "must-have" hospital for health plans because it is by far the largest hospital in the region and the only local provider of certain essential services.

2.  United Regional has maintained its monopoly power in the relevant markets by entering into contracts with commercial health insurers that exclude United Regional's competitors in the Wichita Falls area from the insurers' health-care provider networks ("exclusionary contracts").  These exclusionary contracts effectively prevent insurers from contracting with hospitals and other health-care facilities that compete with United Regional by requiring the insurers to pay a substantial pricing penalty if they also contract with United Regional's competitors.  Most commercial health insurers must pay United Regional 13% to 27% more for its services if they do not use United Regional exclusively.  The effects of this pricing penalty are to make the cost of including a competing hospital or other health-care facility in an insurer's network prohibitively expensive and not commercially viable, and to exclude equally-efficient rivals.

3.  United Regional's exclusionary contracts have reduced competition and enabled United Regional to maintain its monopoly power in the provision of inpatient hospital services and outpatient surgical services.  They have done so by (1) delaying and preventing the expansion and entry of United Regional's competitors, likely leading to higher health-care costs and higher health insurance premiums; (2) limiting price competition for price-sensitive patients, likely leading to higher health-care costs for those patients; and (3) reducing quality competition between United Regional and its competitors.  In this case, there is no valid procompetitive business justification for United Regional's exclusionary contracts.

4.  United Regional's exclusionary contracts unlawfully maintain United Regional's monopoly power in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## II.   DEFENDANT, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

5.  United Regional is a nonprofit corporation organized and existing under the laws of the State of Texas, with its principal place of business in Wichita Falls, Texas.

6.  Plaintiff United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and plaintiff State of Texas brings this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain United Regional's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.  This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4; Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.  United Regional maintains its principal place of business and transacts business in this District.  United Regional entered into the agreements at issue in this District, and committed the acts complained of in this District.  United Regional's conduct has had anticompetitive effects and will continue to have anticompetitive effects in this District.  Consequently, this Court has personal jurisdiction over the defendant, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

9.  United Regional is engaged in, and its activities substantially affect, interstate trade and commerce.  It contracts with providers of commercial health insurance located outside of Texas to be included in their provider networks.  These providers of commercial health insurance make substantial payments to United Regional in interstate commerce.

III.    **RELEVANT MARKETS**

A.      **Relevant Product Markets**

1)      **The sale of inpatient hospital services to commercial health insurers**

10.  The sale of inpatient hospital services to commercial health insurers is a relevant product market.

11.  Inpatient hospital services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient.  Inpatient hospital services *exclude* (1) services at hospitals that serve solely children, military personnel or veterans; (2) services at outpatient facilities that provide same-day service only; and (3) psychiatric, substance abuse, and rehabilitation services.  Although individual inpatient hospital services are not substitutes for each other (*e.g.*, obstetrics and cardiac services are not substitutes for each other), the various individual inpatient hospital services can be aggregated for analytic convenience.

12.  The market for the sale of inpatient hospital services to commercial health insurers excludes outpatient services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase.  There are no other reasonably interchangeable services for inpatient hospital services.

13.  Commercial health insurers include managed-care organizations (such as Blue Cross Blue Shield, Aetna, United Healthcare, CIGNA, Accountable, or other HMOs or PPOs), rental networks (such as Beech Street, Texas True Choice, Multiplan, and PHCS), and self-funded plans.  Rental networks serve as a secondary network used by health insurance companies looking for network coverage or discounts outside of their own networks or by self-insured employers; they are used by small and mid-sized health insurance companies to offer clients

national coverage.  Self-funded plans may access provider networks through managed-care organizations or rental networks.  Although not all of these are risk-bearing entities, they can be referred to collectively as "commercial health insurers."  Commercial health insurers *do not* include government payers (Medicare, Medicaid, and TRICARE).

14.  The market for the sale of inpatient hospital services to commercial health insurers *excludes* sales of such services to government payers.  The primary government payers are the federal government's Medicare program (coverage for the elderly and disabled), the joint federal and state Medicaid programs (coverage for low-income persons), and the federal government's TRICARE program (coverage for military personnel and families).  The federal government sets the rates and schedules at which the government pays health-care providers for services provided to individuals covered by Medicare, Medicaid, and TRICARE.  These rates are not subject to negotiation.

15.  In contrast, commercial health insurers negotiate rates with health-care providers and sell health insurance policies to organizations and individuals, who pay premiums for the policies.  Generally, the rates that commercial health insurers pay health-care providers are substantially higher than those paid by government payers (Medicare, Medicaid, and TRICARE).

16.  There are no reasonable substitutes or alternatives to inpatient hospital services sold to commercial health insurers.  A health-care provider's negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payers, and health-care providers could, therefore, target a price increase just to commercial health insurers.  Commercial health insurers cannot shift to government rates in response to an increase in rates for inpatient hospital services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for

commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of inpatient hospital services sold to commercial health insurers could profitably maintain supracompetitive prices for those services over a sustained period of time.

### 2) The sale of outpatient surgical services to commercial health insurers

17.  The sale of outpatient surgical services to commercial health insurers is a relevant product market.

18.  Outpatient surgical services are a broad group of surgical diagnostic and surgical treatment services that do not require an overnight stay in a hospital.  Outpatient surgical services are typically performed in a hospital or other specialized facility, such as a free-standing ambulatory surgery center that is licensed to perform outpatient surgery.  Outpatient surgical services are distinct from procedures routinely performed in a doctor's office.  Outpatient surgical services *exclude* services at hospitals or other facilities that serve solely children, military personnel, or veterans.  Although individual outpatient surgical services are not substitutes for each other (*e.g.*, orthopedic and gastroenterological surgical services are not substitutes for one another), the various individual outpatient surgical services can be aggregated for analytic convenience.

19.  The market for the sale of outpatient surgical services to commercial health insurers excludes inpatient hospital services; because health plans and patients would not substitute inpatient care for outpatient surgical services in response to a sustained price increase.  There are no other reasonably interchangeable services for outpatient surgical services.

20.  There are no reasonable substitutes or alternatives to outpatient surgical services sold to commercial health insurers.  A health-care provider's negotiations with commercial health

insurers are separate from the process used to determine the rates paid by government payers, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for outpatient surgical services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of outpatient surgical services sold to commercial health insurers could profitably maintain supracompetitive prices for those services over a sustained period of time.

### B.   Relevant Geographic Market

21.  The relevant geographic market for each of the relevant product markets alleged above is no larger than the Wichita Falls Metropolitan Statistical Area ("MSA"). The Wichita Falls MSA is comprised of Archer, Clay, and Wichita counties. MSAs are geographic areas defined by the U.S. Office of Management and Budget for use in Federal statistical activities.

22.  Wichita Falls is the largest city in the Wichita Falls MSA. According to the 2008 estimates of the Census Bureau, the Wichita Falls MSA has a population of about 150,000. About 100,000 of these people reside in the city of Wichita Falls, which is located in Wichita County near the border of the three counties that compose the Wichita Falls MSA. Wichita Falls is in north central Texas, about a two-hour drive from the nearest metropolitan areas: Dallas-Fort Worth, Texas, and Oklahoma City, Oklahoma.

23.  Commercial health insurers contract to purchase inpatient hospital services and outpatient surgical services in the geographic area in which their health plan beneficiaries are likely to seek medical care. Health plan beneficiaries typically seek medical care close to their

homes or workplaces.  Very few plan beneficiaries who live in the Wichita Falls MSA travel outside its borders to seek inpatient hospital services or outpatient surgical services.  For example, in 2008, only about 10% of inpatient discharges of residents of the Wichita Falls MSA were from hospitals not located in the Wichita Falls MSA.  Commercial health insurers that sell policies to beneficiaries in the Wichita Falls MSA cannot reasonably purchase inpatient hospital services or outpatient surgical services outside the Wichita Falls MSA as an alternative to serve those beneficiaries.  Consequently, hospitals and health-care facilities outside the Wichita Falls MSA do not compete with health-care providers located in the Wichita Falls MSA for the sale of the relevant products in a manner that would constrain the pricing or other behavior of Wichita Falls health-care providers.

24.  Competition for the sale of inpatient hospital services to commercial health insurers from providers located outside the Wichita Falls MSA would not be sufficient to prevent a hypothetical monopolist provider of inpatient hospital services to commercial health insurers located in the Wichita Falls MSA from profitably maintaining supracompetitive prices for those services over a sustained period of time.

25.  Competition for the sale of outpatient surgical services to commercial health insurers from providers located outside the Wichita Falls MSA would not be sufficient to prevent a hypothetical monopolist provider of outpatient surgical services to commercial health insurers located in the Wichita Falls MSA from profitably maintaining supracompetitive prices for those services over a sustained period of time.

## IV.   HOSPITALS AND OUTPATIENT SURGICAL FACILITIES IN THE WICHITA FALLS MSA

### A.   Acute-Care Hospitals

26.   There are two general acute-care hospitals in Wichita Falls – United Regional and Kell West Regional Hospital ("Kell West").  Two additional hospitals, Electra Memorial Hospital ("Electra Memorial") and Clay County Memorial Hospital ("Clay Memorial"), are outside Wichita Falls, but within the Wichita Falls MSA.

### 1)   United Regional

27.   United Regional is a 369-bed general acute-care hospital that offers a wide range of inpatient and outpatient services.  United Regional has 14 operating rooms, a laboratory, a 24-hour emergency department, and a Level III trauma center, among other facilities.  It offers comprehensive cardiac care and has a childbirth center.  United Regional is a private nonprofit hospital, not a public hospital.  Its net patient revenues for 2009 were approximately $265 million.

28.   Commercial health insurers that offer health insurance within the Wichita Falls MSA consider United Regional a "must have" hospital because it is by far the largest hospital in the region and the only provider of some essential services, such as cardiac surgery, obstetrics, and high-level trauma care.

29.   United Regional was formed in October 1997 by the merger of what were then the only two general acute-care hospitals in Wichita Falls—Wichita General Hospital ("Wichita General") and Bethania Regional Health Care Center ("Bethania").  To complete the 1997 merger, Wichita General and Bethania sought and obtained an antitrust exemption from the Texas Legislature.  The Legislature enacted Tex. Health & Safety Code Ann. § 265.037(d), which provides that a county-city hospital board "existing in a county with a population of more

- 9 -

than 100,000 and a municipality with a population of more than 75,000 . . . may purchase, construct, receive, lease, or otherwise acquire hospital facilities, including the sublease of one or more hospital facilities, regardless of whether the action might be considered anticompetitive under the antitrust laws of the United States or this state." In an attempt to qualify for the antitrust exemption enacted by the legislature, Wichita General and Bethania Regional entered into a leasing arrangement that involved the Wichita County-City of Wichita Falls, Texas Hospital Board ("County-City Board").

### 2)    Kell West

30.  Kell West Regional is a 41-bed general acute-care hospital that opened in January 1999, partially as a competitive response to the merger that created United Regional.  Kell West provides a wide range of inpatient and outpatient surgical and medical treatments.  Kell West has eleven operating rooms, a laboratory, four intensive care beds, and a 24-hour emergency department.  Kell West currently does not provide several services that United Regional provides, including, in particular, cardiac surgery and obstetrics.  However, United Regional considers Kell West to be a significant competitor.

### 3)    Other Inpatient Facilities

31.  Electra Memorial is a 22-bed hospital located in Electra, Texas, more than 30 miles west of Wichita Falls.  Electra Memorial offers a much narrower range of inpatient hospital services and outpatient surgical services than either United Regional or Kell West.  United Regional does not consider Electra Memorial to be a significant competitor, but instead as a source of referrals.

32.  Clay Memorial is a 25-bed hospital located in Henrietta, Texas, more than 15 miles east of Wichita Falls.  Clay Memorial offers a much narrower range of inpatient hospital services

and outpatient surgical services than either United Regional or Kell West.  United Regional does not consider Clay Memorial to be a significant competitor, but instead as a source of referrals.

**B.      Outpatient Surgical Facilities**

33.   United Regional, Kell West, Electra Memorial, and Clay Memorial all provide outpatient surgical services, although those provided by Electra Memorial and Clay Memorial are more limited than those provided by United Regional and Kell West.  Maplewood Ambulatory Surgery Center ("Maplewood") provides outpatient surgical services focusing solely on surgical procedures for pain remediation.  Texoma Outpatient Surgery Center only performs eye surgeries.  The North Texas Surgi-Center provided some outpatient surgical services in Wichita Falls from 1985 to 2008.  It was excluded from some commercial health insurers' networks by United Regional's exclusionary contracts.  The Surgi-Center closed in December 2008.

34.   There are no other providers of outpatient surgical services in the Wichita Falls MSA.

**C.      Potential Expansion by Competitors**

35.   Both Kell West and Maplewood have significant excess capacity.  Kell West has the capacity to more than double the number of total patients it serves without any additional physical expansion.  In addition, Kell West was intended by its owners to become a full-service hospital.  To this end, Kell West has devoted most of its surplus funds to expansion projects.  In 2002, Kell West nearly tripled in size, expanding from 15 to 41 beds.  In 2005, it added two emergency exam rooms; in 2007, a four-bed intensive care unit; in 2008, an on-site laundry facility; and in 2009, four additional operating rooms.

36.  Kell West's owners originally intended to expand Kell West into a 70-bed hospital with an intensive care unit, OB suite, and cardiology department.  Today, Kell West has 41 beds.  As alleged below, likely because of United Regional's exclusionary contracts, it has not been able to expand into several service lines that it has considered opening, including obstetrics, pediatrics, oncology, industrial medicine, and neurology.  Doctors in the Wichita Falls community have expressed interest in treating additional patients at Kell West if it could expand into new services.

37.  Maplewood currently operates its outpatient surgery center only three days per week and could easily add at least one day more per week to its schedule to accommodate additional patients.

## V.     UNITED REGIONAL'S MONOPOLY POWER

38.  United Regional has monopoly power in the two relevant product markets in the Wichita Falls MSA: (1) the sale of inpatient hospital services to commercial health insurers and (2) the sale of outpatient surgical services to commercial health insurers.  Since the 1997 merger between Wichita General and Bethania, United Regional has dominated both product markets in the Wichita Falls MSA, and its prices have climbed.  It is currently one of the most expensive hospitals in Texas.

### A.     Inpatient Hospital Services

39.  United Regional is by far the largest provider of inpatient hospital services in the Wichita Falls MSA.  United Regional's share of inpatient hospital services sold to commercial health insurers is approximately 90% (based on admissions) in the Wichita Falls MSA.

40.  An analysis prepared for United Regional by a major insurer concluded that the payments from commercial health insurers for inpatient hospital services in Wichita Falls are at

least 50% higher than the average amounts paid in seven other comparable cities in Texas.

Another commercial health insurer estimated that it pays United Regional almost 70% more than

what it pays hospitals in the Dallas-Fort Worth area for inpatient hospital services.  This insurer's

analysis found that the "inpatient allowed per day adjusted for case mix" (a measure that adjusts

for differences in the type and severity of services performed) was $4,143 on average in Wichita

Falls, compared to $3,254 in Dallas-Fort Worth.  The analysis also found that hospital prices in

Wichita Falls are, on average, significantly higher for inpatient services than prices in five other

comparable MSAs in Texas.  United Regional is also significantly more expensive than Kell

West, its primary competitor in Wichita Falls.  For services that are offered by both hospitals,

United Regional's average per-day rate for inpatient services sold to commercial health insurers

is about 70% higher than Kell West's.

### B.   Outpatient Surgical Services

41.  United Regional is also by far the largest provider of outpatient surgical services in

the Wichita Falls MSA.  United Regional's share of outpatient surgical services sold to

commercial health insurers is more than 65% (based on visits) in the Wichita Falls MSA.

42.  United Regional's prices for outpatient surgical services are also among the highest

in Texas.  One commercial health insurer calculated that United Regional's prices for all

outpatient services were in the top 10% of the 279 Texas hospitals that submitted outpatient

claims to that insurer.  Of the 100 Texas hospitals submitting the largest number of outpatient

claims to that insurer in 2007, the insurer found that United Regional was the fourth most

expensive outpatient provider in the state.  Another analysis by a commercial health insurer

shows that hospital prices in Wichita Falls are, on average, significantly higher for outpatient

services than prices in five other comparable MSAs in Texas.  Maplewood, a nearby competitor,

charges much lower prices for outpatient surgical services than United Regional charges for the same services.  Prices at the North Texas Surgi-Center, an ambulatory surgery center in Wichita Falls that performed a wide range of outpatient surgical services but closed in December 2008, were also significantly lower than prices charged by United Regional for identical procedures.

43.   In the Wichita Falls MSA, significant barriers to the entry of new hospital and outpatient facilities as well as barriers to the expansion of existing facilities help preserve United Regional's monopoly power.  For hospitals, barriers to entry include the expense and difficulty of building a hospital, recruiting and hiring qualified staff and physicians, building a reputation in the community, and gaining accreditation from relevant accrediting organizations.  For outpatient facilities, the same barriers exist, but to a lesser extent.  For both hospital and outpatient facilities, the barriers to entry are substantial when combined with the additional entry barriers imposed by United Regional's exclusionary contracts.

## VI.   UNITED REGIONAL HAS WILLFULLY MAINTAINED ITS MONOPOLY POWER THROUGH THE USE OF ANTICOMPETITIVE EXCLUSIONARY CONTRACTS

### A.   The Exclusionary Contracts and Their Terms

44.   All of United Regional's exclusionary contracts share the same anticompetitive feature: a pricing penalty ranging from 13% to 27% if an insurer contracts with Kell West or other competing facilities.  Specifically, the contracts provide for a higher discount off billed charges (*e.g.,* 25%) if United Regional is the only local hospital or outpatient surgical provider in the insurer's network.  The contracts provide for a much smaller discount (*e.g.,* 5% off billed charges) if the commercial health insurer adds another competing local health-care facility, such as Kell West or Maplewood.  A penalty that reduces an insurer's discount from 25% to 5% (for adding a rival facility) increases the insurer's price from 75% to 95% of billed charges—a 27% increase over the discounted price.

45.  The 13% to 27% pricing penalty applies if an insurer contracts with competing facilities within a specific geographic area delineated by each contract.  Though the scope of the geographic limitation differs between contracts, every exclusionary contract designates an area that is no larger than Wichita County, and prevents commercial health insurers from contracting with competing facilities within that area.  For example, one contract prevents the commercial health insurer from contracting with competing facilities within ten miles of the City of Wichita Falls.  Two contracts describe the geographic limitation as within 15 miles of the City of Wichita Falls.  One contract designates certain zip codes located within Wichita County, and three contracts designate Wichita County in its entirety.  In every case, Kell West, Maplewood, and the now-closed Surgi-Center fall within the geographic zone of exclusion defined by the contracts.

46.  United Regional adopted the exclusionary contracts in direct response to the competitive threat presented by Kell West, the North Texas Surgi-Center, and other local outpatient surgical facilities to United Regional's monopoly position in the Wichita Falls MSA.  United Regional began considering the possibility of moving to exclusionary contracts at around the time Kell West began operations.  Shortly thereafter, United Regional began entering contracts with commercial health insurers that effectively prevented them from contracting with Kell West and other local health-care facilities for both inpatient and outpatient services.

47.  By 1999, within three months after Kell West opened for business, United Regional had obtained exclusionary contracts from five commercial health insurers.  United Regional has continued to enter into exclusionary contracts with insurers up to the present day.  As of 2010, United Regional had entered into exclusionary contracts with a total of eight commercial health insurers.  In each instance, it was United Regional that required the exclusionary provisions in the contract—not the insurer.

48. One of the earlier contracts provides as follows:

> <u>Exclusive Agreement</u>. The rates set forth in Exhibit A **[80% of billed charges]** are contingent upon [INSURER] not entering into another agreement with an acute care facility, hospital or ambulatory surgery center, directly or indirectly, for the provision of inpatient services and/or outpatient services in Wichita Falls, Texas or within ten miles of Wichita Falls, Texas. If [INSURER] enters into another agreement with an acute care facility, hospital, or ambulatory surgery Center for the provision of inpatient services and/or outpatient services in Wichita Falls, Texas or within a ten mile radius of Wichita Falls, Texas, Clients shall immediately and automatically begin reimbursing Hospital, for Covered Services rendered by Hospital to Participants, **one hundred percent (100%) of Hospital's billed charges** . . . .

49. A more recent agreement between United Regional and another insurer describes a similar arrangement:

> At this time, [INSURER] elects the Tier 1 Option (defined below). Hospital shall be compensated at seventy-five percent (75%) of billed charges for covered services. However, upon the Effective Date and during the term of this Agreement, if [INSURER] elects to enter into a new contract with another general acute care facility, ambulatory surgery center or radiology center in [a] 15 mile radius of United Regional Health Care System ("Hospital") located at 1600 11th St., Wichita Falls, Texas, [INSURER] shall notify Hospital thirty (30) days in advance of the effective date of such new contract.  On the effective date of such contract, the Tier 1 Option Hospital Reimbursement Schedule shall be void and the reimbursement rates will revert to 95% of billed charges for all inpatient and outpatient services at United Regional Health Care System, its affiliates, and joint ventures [] where United Regional has a majority ownership interest.

> **1. Tier One Option**: Hospital is the sole in-network facility (including only general acute care facilities, ambulatory surgery centers or radiology center[s]) within a 15 mile radius of Hospital located at 1600 11th St., Wichita Falls, Texas and Hospital shall be compensated at **seventy-five percent (75%) of billed charges** for covered services. Payor will deduct any applicable Copayments, Deductibles, or Coinsurance from payment due to Hospital.

> **2. Tier 2 Option**: Hospital is not the sole in-network facility for general acute care, ambulatory surgery center or radiology center within a 15 mile radius of Hospital located at 1600 11th St., Wichita

Falls, Texas and Hospital shall be compensated at **ninety-five percent (95%) of billed charges** for covered services. Payor will deduct any applicable Copayment, Deductibles, or Coinsurance from payment due to Hospital.

50. United Regional has broadened the scope of the exclusionary provisions over time. All eight of the exclusionary contracts effectively prevent the commercial health insurer from contracting with hospital competitors (for inpatient or outpatient services) within a certain geographic proximity to United Regional. Seven of the eight exclusionary contracts also effectively prevent the commercial health insurer from contracting with outpatient surgery centers. United Regional added provisions excluding additional outpatient facilities such as radiology centers to five of the more recent contracts.

51. Although the earlier contracts (signed before 2001) describe the pricing in these agreements in terms of "exclusivity" or an "exclusive agreement," more recent contracts use the phrase "tiered compensation schedule." Regardless of the label, the contracts share the same anticompetitive feature; they impose a significant pricing penalty if an insurer does not enter into an exclusive arrangement with United Regional.

52. Every commercial health insurer that has entered into one of United Regional's exclusionary contracts would prefer an open network in which its customers have a choice of hospitals and outpatient surgical facilities. Most, if not all, of these insurers have sought to add Kell West or another outpatient provider to their networks. In every case, United Regional has threatened the insurer with prices so high that the insurer would not be able to compete with other health insurers offering insurance in the Wichita Falls area. As a result, notwithstanding their preferences, each health insurer contracted exclusively with United Regional because the insurer could not offer a commercially viable product if it paid the higher prices that United Regional would charge if the insurer chose to include in its network one or more of United

Regional's competitors.  One national commercial health insurer, for example, agreed to enter into an exclusionary contract in 2010 because it determined that it could not otherwise offer a commercially viable product in the Wichita Falls MSA.

53.  United Regional has entered into exclusionary contracts with most commercial health insurers currently providing health insurance to residents of the Wichita Falls area.  For more than twelve years, the only major insurer without an exclusionary contract has been Blue Cross Blue Shield of Texas ("Blue Cross"), the largest commercial health insurer in Wichita Falls and in Texas.  For two rental networks, which combined account for less than 5% of the commercially insured lives in Wichita Falls, United Regional offered only the higher nonexclusive rates without an exclusive provision.  In late 2010, after plaintiffs began their investigation, one other rental network switched from an exclusive agreement with United Regional to a non-exclusive arrangement.

54.  All exclusionary contracts entered into between 1998 and 2010 are still in force and are essentially "evergreen" contracts, automatically renewed yearly unless terminated by one of the parties.

**B.      United Regional's Exclusionary Contracts Foreclosed its Rivals from the Most Profitable Health-Insurance Contracts.**

55.     United Regional has effectively foreclosed its rivals from many of the most profitable health-insurance contracts in Wichita Falls—contracts that are crucial for its rivals to effectively compete.

56.  Inclusion in health insurer networks is critical because patients generally seek health-care services from "in-network" providers and thereby incur substantially lower out-of-pocket costs than if the patients use out-of-network providers.  Patients do so because, typically, a health

insurer charges a member substantially lower co-payments or other charges when the member uses an in-network provider.

57.  By effectively denying its competitors critical in-network status, United Regional likely substantially reduces the number of patients who would otherwise use Kell West and other United Regional competitors.  More importantly, United Regional's contracts effectively deny access to a substantial percentage of the most profitable patients—those with commercial health insurance.

58.  It is substantially more profitable for hospitals to serve patients with commercial health insurance than Medicare, Medicaid, or TRICARE patients, because government plans pay significantly less than commercial health insurers.  This is true in the Wichita Falls MSA.  All commercial health plans in the Wichita Falls MSA pay United Regional at least *double* the Medicare payment rate, and all but one insurer (Blue Cross) pay United Regional more than *triple* the Medicare payment rate.

59.  Consequently, patients covered by government plans are not adequate substitutes for commercially insured patients.  In fact, United Regional, like many other hospitals, depends on payments from commercial health insurers to compensate for the comparatively low payments it receives from government payers.  The low payment rates from government payers provide little or no contribution margin to offset United Regional's overhead expenses.

60.  By 2010, the insurers that had exclusionary contracts with United Regional accounted for approximately 35% to 40% of all payments that United Regional received from commercial health insurers.

61.  Most of the remaining commercial payments are attributable to a single commercial health insurer—Blue Cross—which has a 55% to 65% share of the commercially insured lives in

the Wichita Falls MSA.  In the relevant market, serving Blue Cross patients is far less profitable than serving patients covered by other commercial health insurers.  Because of its size, Blue Cross negotiates the deepest discounts; thus, it pays United Regional and other providers in the relevant market substantially less than other commercial health insurers.

62.  Because the insurers that have exclusionary contracts with United Regional pay the highest rates, these insurers account for a substantial share of the profits that would otherwise be available to competing health-care providers.  In particular, these insurers account for approximately 30% to 35% of the profits that United Regional earns from *all* payers—including government payers such as Medicare, Medicaid, and TRICARE—even though they account for only about 8% of United Regional's total patient volume.

63.  If the commercial health insurers that have exclusionary contracts with United Regional added Kell West and other health-care providers to their networks, these providers would earn substantially higher profits than they do now.  For example, if only 10% of these insurers' patients switched from United Regional to Kell West, and these insurers paid Kell West 30% less than they currently pay United Regional, Kell West's profits would still likely increase by more than 40%.

C.     **United Regional's Exclusionary Contracts Likely Have Caused Substantial Anticompetitive Effects.**

64.  United Regional's exclusionary contracts have reduced competition and enabled United Regional to maintain its monopoly power in the provision of inpatient hospital services and outpatient surgical services.  By effectively preventing most commercial health insurers from including in their networks other inpatient and outpatient facilities, such as Kell West, the North Texas Surgi-Center, Maplewood, and others, United Regional has (1) delayed and prevented the expansion and entry of United Regional's competitors, likely leading to higher

health-care costs and higher health insurance premiums; (2) limited price competition for price-sensitive patients, likely leading to higher health-care costs for those patients; and (3) reduced quality competition between United Regional and its competitors.

> **1)** **The exclusionary contracts likely delayed and prevented expansion and entry.**

65.   The exclusionary contracts have likely delayed and prevented competitors from expanding in or entering the relevant markets, leading to higher health-care costs and higher health-insurance premiums.  As alleged above, United Regional's exclusionary contracts effectively prevent virtually all commercial health insurers from contracting with many of United Regional's competitors, including Kell West.  If United Regional had not imposed its exclusionary contracts, these insurers likely would have contracted with Kell West, Maplewood, and other competitors in the Wichita Falls MSA (and with providers that otherwise might have entered the market), giving the competitors in-network access to the patients covered by commercial health insurers—the patients that are the most profitable to health-care providers.

66.   Furthermore, physicians treating patients covered by commercial health insurers that have been effectively prevented from contracting with United Regional's competitors would likely have referred more patients to these competitors, and more patients would likely have chosen to use them.  In addition to referrals of patients insured by commercial health insurers with exclusionary contracts, such referrals would have likely included additional referrals of Blue Cross patients and patients covered by Medicare, Medicaid, and TRICARE.  Many doctors engage in "block-booking," finding it most efficient to perform all of a given day's surgeries and other procedures at the same facility.  This, in turn, would have given United Regional's competitors higher patient volumes and utilization, increased revenues, and substantially higher profits.

67.  The higher volumes and profits obtained from serving additional patients insured by commercial health insurers—the patients that are the most profitable to health-care providers— as well as additional Blue Cross patients and additional Medicare, Medicaid or TRICARE patients, likely would have allowed Kell West and other competitors to expand.  This expansion would enable the competitors to compete more effectively with United Regional, likely resulting in more competition and lower health-care costs.

68.  Kell West likely would have expanded sooner into certain services, and would also likely have added more beds and additional services, such as additional intensive care capabilities, cardiology services, and obstetric services.  Kell West has considered expansion into these additional services on numerous occasions, but has been limited in its ability to expand due to its lack of in-network access to commercially insured patients.  Kell West also would likely fill its significant excess capacity for the services it already provides if it had access to the commercial health insurers that currently have exclusionary contracts with United Regional.

69.  If Maplewood had similar in-network access to those commercial health insurers, it would likely add one or more days to its schedule in order to serve additional patients. Maplewood currently operates only three days a week.

70.  The lack of in-network access to commercially insured patients also likely has delayed and prevented Kell West from expanding by attracting an outside investor or buyer.  For example, with in-network access to commercial health insurance contracts, Kell West would be more attractive to a larger hospital system, which would invest in the expansion of Kell West's services.  As a physician-owned hospital, Kell West became subject in March 2010 to certain restrictions on expansion imposed by federal health-care reform legislation, *see* 42 U.S.C.

§ 1395nn(i)(1)(B), that would not apply if Kell West were acquired by a non-physician investor. The existence of the exclusionary contracts makes such an acquisition less likely.

71.   United Regional's exclusionary contracts also inhibit new providers from entering the market.  Potential entrants are dissuaded from entering the market because they cannot obtain contracts with many of the commercial health insurers who have customers in that market.  At least one potential entrant that is considering entering the outpatient surgical services market believes that it will not be able to do so without contracts with virtually all area commercial health insurers.  United Regional's exclusionary contracts currently prevent such access.

72.   By limiting the expansion or entry of competitors, United Regional's exclusionary contracts have helped it to maintain its monopoly and likely increased the cost of providing medical care to residents in the Wichita Falls area.  Because the exclusionary contracts likely limited competitors' expansion and entry, and thereby reduced insurers' bargaining leverage with United Regional, the contracts likely have enabled United Regional to continue to demand higher prices from commercial health insurers free from competitive discipline.

73.   The costs of medical care are typically 80% or more of an insurer's costs, and hospital costs are a substantial portion of medical care costs.  The price of hospital services at individual hospitals directly affects health insurance premiums for the customers that use those hospitals.  Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices.

74.   The higher payment rates demanded by United Regional from commercial health insurers are borne in part by Wichita Falls employers and residents in the form of higher insurance premiums.  Insurance premiums in Wichita Falls are among the highest in Texas.  Blue Cross's premiums in Wichita Falls exceed its premiums anywhere else in the state, including

Dallas, and its employee premium rate in Wichita Falls is significantly higher than in Amarillo and Odessa, two cities similar in size to Wichita Falls.

**2)      The exclusionary contracts likely have limited price competition for price-sensitive patients.**

75.  United Regional's contracts have also likely reduced competition for price-sensitive patients in the relevant markets.  Certain patients select a hospital based on price because the prices charged can affect the patient's out-of-pocket costs.  For example, in 2008, United Regional lowered its list price for gynecological surgeries because it was concerned that too many price-sensitive patients were choosing Kell West or the North Texas Surgi-Center for these surgeries to avoid United Regional's high prices.  Exclusionary contracts that effectively prevent insurers from including providers such as Kell West in commercial health insurers' networks make it less likely that a commercially insured patient would switch to Kell West in response to a price increase by United Regional, and hence reduce this constraint on United Regional's prices.  Consequently, the exclusionary contracts likely enable United Regional to charge higher prices for many services.

**3)      The exclusionary contracts likely have reduced quality competition between United Regional and its competitors.**

76. Patients and physicians often choose among hospitals and other health-care providers based on the provider's quality and reputation, including quality of care (reflected in past performance on clinical measures such as mortality rates) and quality of service (reflected in non-clinical characteristics that may appeal to patients, including amenities such as physical surroundings, staff hospitality, and other services).  Because there is a financial penalty for using out-of-network providers, patients with health insurance provided by insurers with exclusionary

contracts are less likely to choose out-of-network providers, even if the patient believes the out-of-network provider offers superior quality to United Regional.

77.  If United Regional's competitors became in-network providers for more commercially insured patients, each of those competitors would have the incentive to make additional improvements in quality to attract those patients to its facility.  United Regional, in turn, would also have the incentive to improve its quality in order to keep patients from choosing Kell West or another competitor.  Therefore, without the exclusionary contracts, United Regional and its competitors would have increased incentives to make additional quality improvements, and the overall level of quality of health care in the Wichita Falls area likely would be higher. Moreover, such quality improvements would benefit all patients, not just those with commercial health insurance.

**D.    United Regional's Exclusionary Contracts Have the Potential to Exclude Equally-Efficient Competitors.**

78.  United Regional's exclusionary contracts have likely excluded equally-efficient competitors.  When the entire "discount" that a commercial health insurer receives in exchange for agreeing to exclusivity is allocated to the patient volume that United Regional would likely lose to a competitor in the absence of the exclusionary contracts (the "contestable patient volume"), it is clear that United Regional is selling services to commercial health insurers for the contestable volume at a price below its own marginal costs.  A competing hospital, therefore, would need to offer a price below United Regional's marginal cost to induce a commercial health insurer to turn down exclusivity.

79.  Put differently, because the contestable patient volume is likely a small portion of a commercial health insurer's total volume at United Regional and because the pricing penalty in United Regional's contracts is so large, a commercial health insurer would not find it

commercially reasonable to enter into a contract with a competing hospital in the Wichita Falls

area, unless that hospital were to offer a price below United Regional's marginal cost.  As a

result, United Regional's exclusionary contracts likely exclude equally-efficient competitors.

>   **E.      The Exclusionary Contracts Lack a Valid Procompetitive Business Justification.**

80.  In this case, there is no valid procompetitive business justification for United

Regional's exclusionary contracts.  United Regional did not use the contracts to achieve any

economies of scale or other efficiencies as a result of any additional patient volume that it

obtained from the contracts.  Moreover, as alleged above, United Regional's contracts set prices

for the contestable patient volume at a level below its own incremental costs, which (1)

illustrates that the contracts are not simply lower prices in exchange for volume, and (2) cannot

be justified by economies of scale in any event.

## VII.   VIOLATIONS ALLEGED

<u>Monopolization in Violation of Sherman Act § 2</u>

81.  Plaintiffs repeat and reallege the allegations of paragraphs 1 through 80 above with

the same force and effect as though said paragraphs were set forth here in full.

82.  United Regional possesses monopoly power in the relevant product markets in the

Wichita Falls MSA.

83.  United Regional has willfully maintained and abused its monopoly power in the

relevant markets through its exclusionary contracts with commercial health insurers.

84.  Each exclusionary contract between United Regional and a commercial health

insurer constitutes an act by which United Regional willfully exploits and maintains its

monopoly power in the relevant product markets in the Wichita Falls MSA.

85.  In this case, there is no valid procompetitive business justification for United Regional's use of the exclusionary contracts described above.

86.  United Regional's exclusionary contracts violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

a)  That the Court adjudge and decree that United Regional acted unlawfully to maintain a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b)  That the Court permanently enjoin United Regional, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, negotiating for, agreeing to, continuing, maintaining, renewing, using, or enforcing, or attempting to enforce exclusionary contracts with health insurance companies and others;

c)  That the Court reform existing contracts to remove the exclusionary provisions; and

d)  That Plaintiffs be awarded the costs of this action and such other relief as may be appropriate and as the Court may deem just and proper.

Dated: February 25, 2011

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**

s/ Christine A. Varney
Christine A. Varney
Assistant Attorney General for Antitrust


s/ Joseph F. Wayland
Joseph F. Wayland
Deputy Assistant Attorney General


s/ Patricia A. Brink
Patricia A. Brink
Director of Civil Enforcement


s/ Joshua H. Soven
Joshua H. Soven, Chief
Litigation I Section


s/ Peter J. Mucchetti
Peter J. Mucchetti, Assistant Chief
Litigation I Section

s/ Scott I. Fitzgerald
Scott I. Fitzgerald (WA Bar #39716)
Andrea V. Arias
Amy R. Fitzpatrick
Adam Gitlin
Steven B. Kramer
Richard Liebeskind
Richard D. Mosier
Mark Tobey
Kevin Yeh

Attorneys for the United States
United States Department of Justice
Antitrust Division
Litigation I Section
450 Fifth Street, N.W.
Suite 4100
Washington, DC 20530
Telephone: (202) 353-3863
Facsimile: (202) 307-5802

**FOR PLAINTIFF STATE OF TEXAS**

Greg Abbott
Attorney General of Texas

Daniel T. Hodge
First Assistant Attorney General

Bill Cobb
Deputy Attorney General for Civil Litigation


s/ John T. Prud'homme, Jr.
John T. Prud'homme, Jr.
Chief, Antitrust Division
Office of the Attorney General
300 W. 15th St., 7th floor
Austin, TX 78701
Telephone: (512) 936-1697
Facsimile: (512) 320-0975